UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
                                                :

M.P.L.,                                   :
                                                :

                        Petitioner,   :
                                                :                        25-CV-5307 (VSB)

                  -against-      :
                                                :                    **OPINION & ORDER**

Paul Arteta, in his official capacity as Sheriff  :
of Orange County, New York and Warden of  :
the Orange County Correctional Facility, *et al*.,:
                                                :

                    Respondents.  :
                                                :
--------------------------------------------------------X

<u>Appearances</u>:

Lucas S. Marquez
Molly Lauterback
Melinda K. Sheild
Brooklyn Defender Services
Brooklyn, NY
*Counsel for Petitioner*

Jessica F. Rosenbaum
United States Attorney's Office, Southern District of New York
New York, NY
*Counsel for Respondents*

<u>VERNON S. BRODERICK, United States District Judge</u>:

       Before me is M.P.L.'s ("M.P.L." or "Petitioner") motion for a temporary restraining

order or preliminary injunction directing his release from Immigration and Customs Enforcement

("ICE") detention on the grounds that Respondents' application of the automatic stay provision

pursuant to 8 C.F.R. § 1003.19(i)(2) after Petitioner was granted his release on bond by an

immigration judge violates his substantive and procedural due process rights under the Fifth

Amendment and is *ultra vires* under the Immigration and Nationality Act ("INA") in that it

exceeds the authority that Congress conferred upon the Department of Homeland Security ("DHS"). (Doc. 30.) In opposition, Respondents argue that I lack jurisdiction over Petitioner's motion because they complied with my previous Opinion & Order directing the Government to provide an individualized bond hearing before an immigration judge, and that Petitioner's continued detention is constitutional. (Doc. 35.) For the reasons stated below, DHS's invocation of the automatic-stay regulation to stop Petitioner's release according to an immigration judge's bond determination violates his Fifth Amendment's guarantee of due process.[1] Petitioner's motion is GRANTED.

## I.    Factual and Procedural Background[2]

M.P.L., a citizen of El Salvador, was arrested on February 27, 2025 by agents from the U.S. Drug Enforcement Administration on immigration charges and transferred to ICE custody. (R&R 2; *see also* Doc. 11-2 (Petitioner's Record of Arrests and Prosecutions sheet) at 3.) Since February 28, 2025, ICE has detained M.P.L. at Orange County Jail in Goshen, New York "under the mandatory provisions of [8 U.S.C.] § 1226(c) due to alleged material support of a terrorist group," despite his claim that he was coerced into becoming a member of the Mara Salvatrucha gang ("MS-13"). (Doc. 13 ("Morrow Decl.") ¶ 9; Doc. 1 ("Petition" or "Pet.") ¶¶ 11, 31.) To date, Petitioner has been detained for approximately nine months, including seven months without an individualized bond hearing. *See M.P.L. v. Arteta,* No. 25-CV-5307, 2025 WL 2938993, at *2 (S.D.N.Y. Oct. 16, 2025).

---

[1] My decision is consistent with virtually every district court to consider the legal issues addressed in this Opinion & Order. (*See* Mem. 13–14 (citing 32 cases finding that DHS's use of the automatic stay violates due process); Reply 4 n.2 (citing an additional 6 cases deciding the same).) I have included a list of these decisions—including additional decisions that have been issued since the parties finished briefing the Motion— *infra* in n.6.

[2] I assume familiarity with the more complete factual and procedural background as thoroughly set out in the Report and Recommendation of Magistrate Judge Stewart D. Aaron, (Doc. 24 ("Report" or "R&R")), and my Opinion & Order adopting the Report, (Doc. 27 ("Opinion")).

On June 25, 2025, M.P.L. filed his Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2241. (Doc. 1.) On September 4, 2025, Magistrate Judge Aaron issued the R&R, recommending that I grant the Petition. (Doc. 24.) After the Government filed its objections to the Report on September 18, 2025, (Doc. 25), and the Petitioner filed his response on October 2, 2025, (Doc. 26), I issued the Opinion on October 16, 2025 granting the Petition, (Doc. 27). I held, in part, that under the framework set forth by the Second Circuit in *Black v. Decker*, 103 F.4th 133 (2d Cir. 2024), Petitioner's prolonged detention—at that point more than seven months—without a bond hearing deprived him of due process. *See M.P.L*, 2025 WL 2938993, at *2–*5. Thus, I ordered that (1) the Government provide Petitioner with "an individualized bond hearing in front of an immigration judge to determine whether his continued detention is justified, (2) that at such hearing, the Government shall bear the burden of proving by clear and convincing evidence that Petitioner poses a risk of flight or a danger to the community, and (3) that the immigration judge must consider alternatives to detention and Petitioner's financial ability to pay a bond in making the bond determination." *Id*. at *1. I ordered the Government to provide Petitioner with such a bond hearing within 14 days of the Opinion or to release him from detention if such a bond hearing was not provided. *Id.* at *7.

On October 28, 2025, Immigration Judge ("IJ") Charles Conroy held a bond hearing (the "Bond Hearing") pursuant to my Opinion. *See M.P.L.*, 2025 WL 2938993, at *7; *see also* Doc. 38-1 ("Bond Hearing Tr."). Petitioner's counsel lodged multiple objections to the evidence submitted by DHS, including that DHS submitted a Form I-213 during the Bond Hearing that contradicted the Form I-213 submitted during Petitioner's deportation proceedings because the Form I-213 submitted for the Bond Hearing stated that Petitioner "identified as a Member/Active of MS-13," (Doc. 30-8 at 2), whereas the Form I-213 submitted by DHS during Petitioner's

merits hearing for his deportation proceedings stated that Petitioner "identified as a Member/Inactive of MS-13," (Doc. 30-7 at 2).  (*See* Doc. 30-1 ("Lauterback Decl.") ¶ 5; Bond Hearing Tr. 6–14.)  The IJ described the discrepancies between the two Form I-213s as "highly questionable" and gave the documents "diminished weight," stating that he was "not going to be able to rely on" the Form I-213.  (Bond Hearing Tr. 13:9-10, 13:18-19.)[3]  After Petitioner's counsel made additional objections, the IJ also gave "diminished weight" to the RAP sheet filed by DHS, (*id.* at 15:5), excluded DHS's submission of an Interpol Notice purporting to be about M.P.L. for failure to have a certificate of translation, (*id.* at 16:4-16), deferred on making a decision as to the inclusion of photographs purporting to be of Petitioner, (*id.* at 17:16-20), gave "diminished weight" to an article provided by DHS that did not have information regarding the author and the date it was published, (*id*. at 18:5-7), and gave "diminished weight" to another article provided by DHS where the provided hyperlink was broken "and the website from which the article purportedly originated seemed to just be a collection of posts on random topics," (Lauterback Decl. ¶ 5; Bond Hearing Tr. 18:8-19:9).

Counsel for DHS and Petitioner then proceeded to make their arguments.  DHS first argued that Petitioner "is subject to mandatory detention under INA [§] 235[(b)] and/or [§] 236[(c)] . . . [because] he's a member of the MS[-]13, a designated foreign terrorist organization" and is also "inadmissible under INA § 212(a)(3)(B) as an alien who provided material support to members of an undesignated foreign terrorist organization, MS[-]13."  (Bond Hearing Tr. 21:22-

---

[3] I asked the Government whether they have ever seen a discrepancy between someone being an active and inactive member on a Form I-213 and counsel for the Government confirmed that she had never seen a switch from active membership to inactive membership or vice versa, but she had seen changes to a Form I-213 which indicated when the change was made with a signature and date, which is not present in the Form I-213s here. (*See* Transcript from Nov. 6, 2025 Order to Show Cause Hearing ("Tr.") 27:18-28:5.)  Moreover, the Government's counsel stated that she asked DHS to explain the discrepancy between the two Form I-213s but "they were not able to explain the timing of these documents and why one says inactive and one says active." (*Id*. at 27:5-9.)  I agree with the IJ, the discrepancies appear to be "highly questionable."  I also find DHS's inability to explain them suspicious.  However, I need not resolve this factual issue to reach my decision here.

23, 22:4-12.)  Next, DHS argued that Petitioner presented a danger to the community because he

"is a self-professed MS[-]13 gang member," (*id.* at 22:13-14), and described, generally,

"criminal activity [that MS-13] has conducted in the United States and around the world," (*id.* at

24:7-8, *see id.* at 23:4-24:19).  Finally, DHS argued that Petitioner presented a flight risk that

would not be mitigated by any bond because "[t]here's no sponsor identified in the [Petitioner's]

submission who would post bond on his behalf," (*id.* at 25:23-25), Petitioner had no "fixed

permanent address" to return to upon his release, (*id.* at 26:5), Petitioner's partner did not submit

a letter in support of him, (*id.* at 26:10-12), the letters in support "did not confirm that

[Petitioner] has a job waiting for him" upon his release, (*id.* at 26:19-20), there was no evidence

of Petitioner filing taxes or maintaining bank accounts, (*id.* at 26:4-7, 26:24-25), and the May 23,

2025 removal decision is on appeal with the Board of Immigration Appeals ("BIA"), (*id.* at 27:9-

12).

      Next, counsel for Petitioner presented her arguments.  Counsel argued that, pursuant to

my Opinion, Petitioner is entitled to an individualized bond hearing, and the Government failed

to meet its burden on dangerousness by making general statements regarding MS-13's illicit

activities.  (Bond Hearing Tr. 29:6-13.)  Moreover, Petitioner's counsel argued that both Form I-

213s, although contradictory of one another in one respect, were in agreement that Petitioner

"stated he was a member of MS 13," (*see* Doc. 30-7 at 3; Doc. 30-8 at 3), and not that he "is" a

member of MS-13.  (Bond Hearing Tr. 29:13-19.)  Petitioner's counsel next argued that the

warrant for his arrest in El Salvador "alleges that [Petitioner] engaged in extortion in 2007 and

2008" but Petitioner was "present in the United States in 2007 and 2008," and Petitioner's

counsel produced evidence for the record of Petitioner's presence in the United States during the

Bond Hearing.  (*Id.* at 30:5-16.)  Petitioner's counsel next detailed mitigating factors, including

numerous letters of support attesting to his good character and the fact that he has lived in the
United States for eighteen years without a criminal record. (*See id.* at 30:17-31:4.) With regard
to flight risk, Petitioner's counsel detailed additional mitigating factors, including that members
of the Orthodox Jewish community have continued to visit Petitioner at the ICE detention
facility, have attended all of his court hearings, and have provided his family with support. (*Id.*
at 31:5-20.) Moreover, contrary to DHS's arguments, Petitioner's social worker submitted a
letter stating that his employer has assured that there would be a job for Petitioner after his
release, (*id.* at 31:7-13; *see also* Doc. 30-4 ("Letters of Support") at 4), Petitioner's daughter's
submitted a letter in support stating that Petitioner "has a place to stay if he is released" and
listing her address, (Bond Hearing Tr. 31:20-25; *see also* Letters of Support 11), and members of
the Orthodox Jewish community have also offered Petitioner a place to live (Bond Hearing Tr.
32:23-33:4; *see also* Letters of Support 10 ("If necessary, I would be more than happy to sponsor
him a place to stay until his case is resolved."); *see also id.* at 26 ("We would also be committed
to find him housing during the time he would be released on bond.")). Moreover, Petitioner's
counsel argued that he is likely to return to court because his BIA appeal is pending, in which
Petitioner's counsel will continue representing Petitioner. (Bond Hearing Tr. 32:11-19.)

Counsel for DHS then had an opportunity to provide a closing argument, during which
counsel argued that the "glaring mystery" was that Petitioner has no tax returns. (Bond Hearing
Tr. 34:25-35:13.) The IJ noted that DHS had the opportunity to ask Petitioner about his taxes but
did not do so. (*Id.* at 35:14-16.) Counsel for DHS asked whether she should ask Petitioner about
his lack of tax returns now, but the IJ said that it was too late to do so in closing arguments. (*Id.*
at 35:17-20.)

The IJ then issued an oral finding that DHS had not met its burden to prove that M.P.L.

was a danger to the community, but that DHS had met its burden to prove that M.P.L. is a flight risk. (Bond Hearing Tr. 35:23-36:3.) In addressing flight risk, the IJ noted that M.P.L. could be a "significant" flight risk based on the warrant for his arrest in El Salvador, the removal order against him, and the limited protection under the Convention Against Torture ("CAT"). (*Id*. at 36:5-13.) Nonetheless, the IJ found that there were bond conditions that could mitigate the risk of flight. (*Id*. at 36:14-15.) The IJ granted M.P.L.'s release under a $1,500 bond, with the additional conditions of wearing an ankle monitor and weekly reports to ICE. (*Id*. at 36:16-19; Doc. 30-2 ("IJ Order").)

In a written order issued later, on November 12, 2025, the IJ summarized his findings as follows:

### a. Danger to the Community

The Court finds that the Department failed to meet its burden to demonstrate that the Respondent presents a danger to the community. In support of its position as to dangerousness, the Department submitted a redacted Form I-213, a redacted RAP sheet, an arrest warrant, the Court's decision on the merits dated May 23, 2025, tattoos of the Respondent, and background articles on gang tattoos and MS-13. *See* Exh. B2, B3. The Court notes that these submissions reveal that the Respondent has no criminal history during his eighteen years in the United States. *Id.; see also* Exh. Bl.

The Department argues that the Respondent is a danger to the community because he is a "self-proclaimed member of MS-13'" who is subject to an arrest warrant in El Salvador for extortion and aggravated homicide. DAR (October 28, 2025). The Department has provided the Court with numerous articles about the generalized danger of MS-13. *See* Exh. B2. Additionally, the Department argues that the Respondent being subject to an arrest warrant in El Salvador for alleged extortion and aggravated homicide demonstrates the Respondent's dangerousness to the community of the United States. *See* Exh. B3, Tab D. While the Court understands the Department's concerns about the dangers of gang involvement, the Department has failed to provide any evidence that the Respondent has engaged in criminal activity or continued his membership in MS-13 since arriving in the United States 18 years ago. DAR (October 28, 2025); *see also* Exhs. B2, B3, Tab D. Indeed, the District Court Order indicates that the Respondent has had no criminal record since his arrival in the United States in 2007. Exh. Bl.

Moreover, the Department alleges that the Respondent has not paid his taxes in the 18 years he has resided in the United States. DAR (October 28, 2025). The Court need not make any findings regarding whether the Respondent did, in fact, pay his taxes. Rather, it is the Department's burden to show, by clear and convincing evidence, that the Respondent is a danger to the community. They have failed to do so, having offered nothing further to substantiate the conclusory claims regarding the Respondent's alleged failure to pay taxes nor how the Respondent's past involvement in MS-13 18 years ago in El Salvador is evidence of the Respondent's current dangerousness. Accordingly, the Department has failed to meet its burden as to dangerousness.

**b. Flight Risk**

The Court finds that the Department has met its burden to demonstrate, by clear and convincing evidence, that the Respondent presents a high flight risk; however, the Court finds that the Respondent's flight risk can be mitigated by reasonable conditions of supervision and monetary bond. Indeed, the Department's submissions of the underlying merits decision by the Court dated May 23, 2025, wherein the Court found the Respondent ineligible for relief or protection under the Convention Against Torture, and the arrest warrant for the Respondent in El Salvador demonstrate the Respondent's high risk of flight. *See* Exh. B3, Tabs D, E. While the Court notes that the Respondent has factors that weigh in his favor, most notably the absence of any criminal history or history evading legal processes in the United States, as well as having a daughter in the United States ready to provide a permanent address for the Respondent, and steady employment by Aaron Ambalu at his law office, this is insufficient to mitigate the Court's concerns regarding the Respondent's risk of flight. *See* Exh. B4, *but see* Exh. B3, Tabs D, E.

Based on all the evidence in the record, the Court finds the Department has met its burden to demonstrate the Respondent is a flight risk, but that such flight risk concerns can be mitigated by the Respondent posting bond in the amount of $1,500, along with other alternatives to detention including an ankle electronic GPS monitor and regular reporting to ERO-ICE not to exceed one time per week.

(Doc. 39-1.)

The Bond Hearing ended at approximately 2:10 p.m. on October 28, 2025.[4] (*See* Tr.

6:15.) At approximately 2:16 p.m., Petitioner's employer made a bond payment request through

the website cebonds.ice.gov, expressing an intent to pay the $1,500 bond. (Lauterback Decl. ¶

---

[4] Counsel for Petitioner provided the times that the Bond Hearing ended and the bond payment request was made, and the Government has no record of when the Bond Hearing ended or the bond payment request was made. (*See* Tr. 6:12-19, 7:7-13.)

14; Doc. 30-5 (Bond payment request).)  A little over one hour later, at 3:31 p.m., DHS invoked

an automatic stay of Petitioner's release from custody pursuant to 8 C.F.R. § 1003.19(i)(2) by

filing a Form EOIR-43 Notice of ICE Intent to Appeal Custody Redetermination.  (*See* Doc. 31

("Mem.") at 6; Lauter Decl. ¶ 15; Doc. 30-3 (Form EOIR-43); Doc. 30-6 (denying the bond

payment request because "DHS has filed an E-43 automatic stay").)  The Government did not

indicate why the automatic stay was sought, (Tr. 17:10-19), or who specifically made the

determination to seek an automatic stay, (*id.* at 16:9-20).  However, the Government represented

that the general process within DHS would include a discussion and analysis within DHS and

ultimately a supervisor deciding whether to seek an automatic stay.  (*See id.* at 15:3-8.)  DHS did

not proffer, because they did not need to, any individualized analysis regarding the need for an

automatic stay pending the appeal of the IJ's bond determination.  (*See id.* at 10:4-16, 14:22-

15:4; *see also* 8 C.F.R. § 1003.19(i)(2) ("[A]ny order of the immigration judge authorizing

release (on bond or otherwise) shall be stayed upon DHS's filing of a notice of intent to appeal

the custody redetermination (Form EOIR-43) with the immigration court within one business day

of the order.").)  The Form EOIR-43 does not require any articulation prior to seeking an

automatic stay of an IJ's bond determination; instead upon filing the Form EOIR-43, the

automatic stay is invoked without further review by either an IJ or the BIA.  (Tr. 10:4-16, 14:22-

15:4.)  The next day, October 29, 2025, the request for a bond payment was denied because

"DHS has filed an E-43 automatic stay."  (Doc. 30-6).  The invocation of the automatic stay

appears to be a policy change from longstanding immigration practice, although the parties could

not identify any policy or memo providing guidance on DHS's use of the automatic stay

provision.  (*See* Tr. 15:25-16:4, 19:7-20, 20:8-20, 23:1-3.)

On October 29, 2025, Petitioner filed an application for an order to show cause,

temporary restraining order, and preliminary injunction, (Doc. 30 ("Mot." or "Motion")), arguing that DHS's application of the automatic stay after the IJ's bond determination violated Petitioner's due process, and citing 32 district court opinions since May 2025 that held the automatic stay provision unconstitutional, (Mem. 13–14). Petitioner challenges the constitutionality of his continued detention and requests an order directing that he be released from custody, "subject to reasonable and appropriate conditions, and enjoin Respondents from arresting him for civil immigration detention purpose." (Mot. 2.) In the alternative, Petitioner requests that I conduct the bond hearing. (*Id.*)

Later that same day, I issued an Order to Show Cause setting a hearing for November 6, 2025, and directing the Government to respond to Petitioner's Motion by October 31, 2025, and allowing Petitioner to file a reply by November 4, 2025. (Doc. 32.) Later that day, the Government filed a letter motion requesting an extension of time until November 3, 2025, (Doc. 33), which I granted on October 30, 2025, and gave Petitioner a corresponding one-day extension to file his reply, (Doc. 34). On November 3, 2025, the Government filed its opposition brief, (Doc. 35 ("Opp.")), along with a supplemental declaration of deportation officer William D. Morrow, (Doc. 36), which attached DHS's November 3, 2025, notice of appeal with a certification of a senior legal official, (Doc. 36-1), and a filing receipt of the notice of appeal, (Doc. 36-2). On November 5, 2025, Petitioner filed his reply in support of the Motion, (Doc. 38 ("Reply")), along with two exhibits: the Bond Hearing transcript, (Doc. 38-1), and a supplemental declaration of Molly Lauterback, (Doc. 38-2).

I held the Order to Show Cause Hearing on November 6, 2025. I began the hearing by asking a series of questions, including questions intended to confirm the timeline of events and that there were no factual disputes between the parties. (*See generally* Tr. 3-18.) I also asked

questions about a recent decision in this District which is factually similar and addressed a similar constitutional question, *J.M.P. v. Arteta*, No. 25-CV-4987, 2025 WL 2984913 (S.D.N.Y. Oct. 23, 2025), and the caselaw from the dozens of district court decisions across the country which have determined that DHS's application of the automatic stay violates a detainee's due process rights. (*See* Tr. 24:16-25:9, 36:11-40:5.) I asked whether any of the approximately 40 district court decisions that Petitioners cited have been appealed and Petitioners stated that they would provide an update but have yet to do so.[5] (*See id.* at 38:23-39:10.) I also asked questions to confirm that DHS is still relying on an automatic stay regulation and that they have not sought a discretionary stay, to which the Government responded that it has no knowledge of DHS seeking a discretionary stay or whether they would do so if I were to order that the Petitioner be released. (*See id.* at 8:1-16, 12:1-4.)

The Government also represented that DHS has represented to it that the BIA has previously denied motions for a discretionary stay, and I asked for further briefing on this issue to provide more information regarding those BIA decisions. (*See* Tr. 12:12-24.) On November 13, 2025, the Government filed a letter attaching two orders from the BIA, dated May 30, 2025, and August 4, 2025, in which the BIA denied DHS's request for an emergency stay of an IJ's bond order. (Docs. 40, 40-1, 40-2.) The Government states that it would be "burdensome to collect all such orders" and thus provided two orders "first, to confirm that the BIA has, in fact, denied certain motions for discretionary stays, and, second, to permit the Court to see the form that these orders have taken." (Doc. 40.) The BIA orders do not contain any reasoning and simply state: "After consideration of all information, the Board has concluded that the motion

---

[5] Nonetheless, I note that one of the decisions—*Mohammed H. v. Trump*, 786 F. Supp. 3d 1149 (D. Minn. 2025)— was appealed and the appellants' brief is due on December 1, 2025. *See Mohammed Hoque v. Donald J. Trump, et al.*, No. 25-2516 (8th Cir.). The issue on appeal is whether the district court erred by exercising jurisdiction over the petitioner's habeas petition and by ordering the petitioner's release from immigration detention. *See id.*

for emergency stay of the bond order will be denied." (Docs. 40-1, 40-2.) I then heard argument from each side and reserved my decision for a written opinion. (*See* Tr. 40:13-43:20.)

## II.    <u>Legal Standard</u>

"It is well established that the standard for an entry of a temporary restraining order is the same as for a preliminary injunction." *AFA Dispensing Grp. B.V. v. Anheuser-Busch, Inc.*, 740 F. Supp. 2d 465, 471 (S.D.N.Y. 2010). "A preliminary injunction is an 'extraordinary' equitable remedy that is 'never awarded as of right.'" *Starbucks Corp. v. McKinney*, 602 U.S. 339, 345–46 (2024) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)). To obtain a preliminary injunction, the movant "must make a clear showing that [(1)] 'he is likely to succeed on the merits, [(2)] that he is likely to suffer irreparable harm in the absence of preliminary relief, [(3)] that the balance of equities tips in his favor, and [(4)] that an injunction is in the public interest.'" *Id.* at 346 (quoting *Winter*, 555 U.S. at 20).

"Irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Sterling v. Deutsche Bank Nat'l Tr. Co. as Trustees for Femit Tr. 2006-FF6*, 368 F. Supp. 3d 723, 727 (S.D.N.Y. 2019) (quoting *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2d Cir. 2005) (citation omitted)). "Thus, if a party fails to show irreparable harm, a court need not [ ] address the remaining elements." *Coscarelli v. ESquared Hosp. LLC*, 364 F. Supp. 3d 207, 221 (S.D.N.Y. 2019). To establish irreparable harm, movants must demonstrate "they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009). Irreparable harm is one for which "money damages cannot provide adequate compensation." *Kamerling v. Massari*, 295 F.3d 206, 214 (2d Cir. 2002) (quoting *N.Y. Pathological & X–Ray Labs., Inc. v. INS*, 523

F.2d 79, 81 (2d Cir. 1975)).  A movant seeking injunctive relief has a "heavier burden" than a plaintiff who must plead a "plausible claim necessary to avoid dismissal."  *New Hope Fam. Servs. v. Poole*, 966 F.3d 145, 165 (2d Cir. 2020) (citation omitted).  Indeed, in considering the motion for a preliminary injunction, I "need not accept all of a [Petitioner's] assertions on a motion for preliminary injunction as true."  *Burroughs v. Cnty. of Nassau*, No. 13-CV-6784, 2014 WL 2587580, at *8 (E.D.N.Y. June 9, 2014) (citations omitted).

### III.  Discussion

#### A.  *Mootness*

As an initial matter, the Government essentially argues that Petitioner's Motion should be denied as moot because Petitioner "received the bond hearing required by this Court's October 16 Order, and he does not argue non-compliance based on any infirmity with that bond hearing, . . . [thus,] the government has fully complied with the Court's order and there is nothing to enforce."  (Opp. 7.)  However, "[t]he Government's argument is based on a formalistic reading of [my Opinion] to provide [M.P.L.] a bond hearing, with no consideration of [my] substantive discussion of [M.P.L.'s] due process rights and the appropriate remedy in this case.  Although [M.P.L.'s] 'rights were likely given full accord in [the bond] hearing[ ], . . . [t]he provision of these rights . . . [was] effectively rendered meaningless by the implementation of the automatic stay provision.'"  *J.M.P.*, 2025 WL 2984913, at *13 (quoting *Ashley v. Ridge*, 288 F. Supp. 2d 662, 671 (D.N.J. 2003) (alterations in original)).  "The Government cannot withstand a procedural due process objection by arguing that due process is provided, then given no import."  *Id.* (quoting *Ashley*, 288 F. Supp. 2d at 671).  Moreover, even if my Opinion "were read to grant a bond hearing as a mere formality with no substantive import, [M.P.L.'s] Motion is properly before [me] because he has not yet been afforded all the relief he requested in his original

Petition—that is, release from detention." *Id*.  Accordingly, I construe the Motion as one to enforce the judgment, and because I have "now received full briefing and held argument on the constitutional questions presented, [I] will proceed [] to an ultimate determination of the merits rather than analyzing the preliminary injunction factors." *Id*.  I note, however, that I would reach the same conclusion if I performed my analysis pursuant to the preliminary injunction factors.

### B.  *Due Process*

"The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge,* 424 U.S. 319, 333 (1976) (internal citations omitted).  The procedural due process requirement applies to deportation proceedings for non-citizens as well. *See, e.g.*, *Reno v. Flores*, 507 U.S. 292, 306 (1993) ("It is well established that the Fifth Amendment entitles aliens to due process of law in deportation proceedings.").  Courts weigh three factors when considering what due process is due:  (1) " the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S. at 335.

At least 50 district court decisions across the United States in the last 6 months alone—including one decision in this District—have found that DHS's application of the automatic stay pursuant to 8 C.F.R. § 1003.19(i)(2) violates a non-citizen's due process under the Fifth Amendment and have held either that DHS cannot legally invoke the automatic stay to detain a non-citizen who has been granted bond by an IJ or have granted preliminary injunctive relief from such detention pursuant to the automatic stay provision if a detainee is granted bond by an

IJ.[6]  As explained in detail below, I am persuaded by the near unanimity of these decisions.

Despite the Government not being aware of any internal guidance directing DHS to seek

automatic stays when an IJ decides to release a non-citizen on bond, (*see* Tr. 20:8-20), the sheer

volume of decisions on this very issue in the last six months make clear that the automatic stay

provision is now relied upon regularly by DHS.  *See J.M.P.*, 2025 WL 2984913, at *11 ("The

automatic stay provision was rarely employed: between 2015 and 2021, the automatic stay

---

[6] *See e.g.*, *Mohammed H*, 786 F. Supp. 3d at 1158; *Günaydin v. Trump*, 784 F. Supp. 3d 1175, 1190 (D. Minn. 2025); *Anicasio v. Kramer*, No. 25-CV-3158, 2025 WL 2374224, at *4 (D. Neb. Aug. 14, 2025); *Garcia Jimenez v. Karmer*, No. 25-CV-3162, 2025 WL 2374223, at *4 (D. Neb. Aug. 14, 2025); *Maldonado v. Olson*, No. 25-CV-3142, 2025 WL 2374411, at *14 (D. Minn. Aug. 15, 2025); *Jacinto v. Trump*, No. 25-CV-3161, 2025 WL 2402271, at *4 (D. Neb. Aug. 19, 2025); *Leal-Hernandez v. Noem*, No. 25-CV-02428, 2025 WL 2430025, at *14 (D. Md. Aug 24, 2025); *Fernandez v. Lyons*, No. 25-CV-506, 2025 WL 2531539, at *4 (D. Neb. Sept. 3, 2025); *Perez v. Berg*, No. 25-CV-494, 2025 WL 2531566, at *4 (D. Neb. Sept. 3, 2025); *Carmona-Lorenzo v. Trump*, No. 25-CV-3172, 2025 WL 2531521, at *4 (D. Neb. Sept. 3, 2025); *Herrera v. Knight*, No. 25-CV-01366, 2025 WL 2581792, at *12 (D. Nev. Sept. 5, 2025); *Martinez v. Noem*, No. 25-CV-01007, 2025 WL 2598379, at *6 (W.D. Tex, Sept. 8, 2025); *Carlon v. Kramer*, No. 25-CV-3178, 2025 WL 2624386, at *4 (D. Neb. Sept. 11, 2025); *Palma v. Trump*, No. 25-CV-3176, 2025 WL 2624385, at *4 (D. Neb. Sept. 11, 2025); *Perez v. Kramer*, No. 25-CV-3179, 2025 WL 2624387, at *4 (D. Neb. Sept. 11, 2025); *Sampiao v. Hyde*, No. 25-CV-11981, 2025 WL 2607924, at *12 (D. Mass. Sept. 9, 2025); *Vazquez v. Feeley*, No. 25-CV-01542, 2025 WL 2676082, at *21 (D. Nev. Sept. 17, 2025); *Arce v. Trump*, No. 25-CV-520, 2025 WL 2675934, at *6 (D. Neb. Sept. 18, 2025); *Barrera v. Tindall*, No. 25-CV-541, 2025 WL 2690565, at *7 (W.D. Ky. Sept. 19, 2025); *Hasan v. Crawford*, No. 25-CV-1408, 2025 WL 2682255, at *13 (E.D. Va. Sept. 19, 2025); *Campos Leon v. Forestal*, No. 25-CV-01774, 2025 WL 2694763, at *5 (S.D. Ind. Sept. 22, 2025); *Singh v. Lewis*, No. 25-CV-2677, 2025 WL 2699219, at *5 (W.D. Ky. Sept. 22, 2025); *Alves da Silva v. U.S. Immigr. & Customs Enf't*, No. 25-CV-284, 2025 WL 2778083, at *6 (D.N.H. Sept. 29, 2025); *Quispe v. Crawford*, 25-CV-1471, 2025 WL 2783799, at *9 (E.D. Va. Sept. 29, 2025); *Silva v. Larose*, No. 25-CV-2329, 2025 WL 2770639, at *5 (S.D. Cal. Sept. 29, 2025); *Quispe-Ardiles v. Noem*, No. 25-cv-0138, 2025 WL 2783800, at *10 (E.D. Va. Sept. 30, 2025); *Arcos v. Noem*, No. 25-CV-04599, 2025 WL 2856558, at *3 (S.D. Tex. Oct. 8, 2025); *Eliseo A.A. v. Olson*, No. 25-3381, 2025 WL 2886729, at *7 (D. Minn. Oct. 8, 2025); *Carlos v. Noem*, No. 25-CV-01900, 2025 WL 2896156, at *7 (D. Nev. Oct. 10, 2025); *Merino v. Ripa*, 25-23845-CIV, 2025 WL 2941609, at *4 (S.D. Fla. Oct. 15, 2025); *Hernandez v. Crawford*, No. 25-CV-01565, 2025 WL 2940702, at *3 (E.D. Va. Oct. 16, 2025); *Maza v. Hyde*, No. 25-12407, 2025 WL 2951922, at *3–*4 (D. Mass. Oct. 20, 2025); *J.M.P. v. Arteta*, No. 25-CV-4987, 2025 WL 2984913, at *2 (S.D.N.Y. Oct. 23, 2025); *Aparicio v. Noem*, No. 25-CV-01919, 2025 WL 2998098, at *6 (D. Nev. Oct. 23, 2025); *Lopez v. Soto*, No. 25-CV-16303, 2025 WL 2987485, at *3 (D.N.J. Oct. 23, 2025); *Souza v. Hyde*, No. 25-CV-12461, 2025 WL 2997670, at *5 (D. Mass. Oct. 24, 2025); *Dominguez-Lara v. Noem*, No. 25-CV-01553, 2025 WL 2998094, at *6 (D. Nev. Oct. 24, 2025); *Garcia Picazo v. Sheehan*, No. C25-4057, 2025 WL 3006188, at *5 (N.D. Iowa Oct. 27, 2025); *Martinez-Elvir v. Olson*, No. 25-CV-589, 2025 WL 3006772, at *13 (W.D. Ky. Oct. 27, 2025); *Puerto-Hernandez v. Lynch*, No. 25-CV-1097, 2025 WL 3012033, at *11 (W.D. Mich. Oct. 28, 2025); *Cabrera v. Mattos*, No. 25-CV-01551, 2025 WL 3072687, at *14 (D. Nev. Nov. 3, 2025); *Almeida de Souza v. Moniz*, No. 25-CV-12509, 2025 WL 3101763, at *4 (D. Mass. Nov. 6, 2025); *Mendez v. Noem*, No. 25-CV-02062, 2025 WL 3124285, at *5 n.6 (D. Nev. Nov. 7, 2025); *Otilio B.F. v. Andrews*, No. 25-CV-01398, 2025 WL 3152480, at *11–*12 (D. Nev. Nov. 11, 2025); *Guttierez v. Thompson*, No. 4:25-4695, 2025 WL 3187521, at *8 (S.D. Tex. Nov. 14, 2025); *Salgado v. Mattos*, No. 25-CV-01872, 2025 WL 3205356, at *26 (D. Nev. Nov. 17, 2025); *De Leon Hernandez v. Bondi*, No. 25-CV-1384, 2025 WL 3217037, at *3 (W.D. La. Nov. 18, 2025); *Perez Sales v. Mattos*, No. 25-CV-01819, 2025 WL 3237366, at *4 (D. Nev. Nov. 19, 2025); *Castillo v. De Andra-Ybarra*, No. CV 25-1074, 2025 WL 3251223, at *9 (D.N.M. Nov. 21, 2025); *Guasco v. McShane*, No. 25-CV-1650, 2025 WL 3270201, at *3 (M.D. Pa. Nov. 24, 2025).

provision was used on average only 26 times per year, on a detained population that numbers in

the tens of thousands on any given day, with only two cases being subject to the automatic stay

in 2021. . . . But as indicated by the dozens of court cases holding the automatic stay provision

unconstitutional in the past few months, the automatic stay is apparently now being used with far

more frequency." (internal citation omitted)).[7] The Government requests that I ignore precedent

---

[7] As Petitioner pointed out in the Order to Show Cause Hearing, there are two recent cases—*Malan v. Noem*, No. CV 25-12570, 2025 WL 3012855 (D. Mass. Oct. 27, 2025) and *Rojas v. Olson*, No. 25-CV-1437, 2025 WL 3033967 (E.D. Wis. Oct. 30, 2025)—which have held that DHS's use of the automatic stay can comport with due process. Neither case is binding on me, and I do not find either of those decisions persuasive, especially against the weight of the vast majority of cases, which have held that DHS's invocation of the automatic stay to detain a non-citizen who has been granted bond does not comport with due process. *See supra* n.6. In *Malan*, the petitioner was detained on July 25, 2025—five months after the Petitioner here was detained—and was afforded a bond hearing on August 21, 2025, after which DHS appealed the IJ's bond determination and sought an automatic stay. 2025 WL 3012855, at *1. Although recognizing that "detention pending the outcome of either the appeal or the removal proceedings is indefinite and would tip the *Mathews* factors in favor of the petitioner," the Court in *Malan* found that the "petitioner's continued detention is constitutional only so long as that detention does not exceed the 150 days as prescribed by regulation," in other words, if the detention "exceeds 150 days from the application of the automatic stay." *Id*. at *2–*3. I disagree with the holding in *Malan* that an additional detention period up to 150 days under the automatic stay provision, in addition to the Petitioner's detention since arrest, is a "balance [of] the important, countervailing interests of the parties," *id*. at *2, especially in this case, as explained throughout this Opinion & Order. In *Rojas*, the petitioner was detained on June 3, 2025—three months after the Petitioner here was detained— and was afforded a bond hearing on July 15, 2025, after which DHS appealed the IJ's bond determination and sought an automatic stay. 2025 WL 3033967, at *1–*2. The Court in *Rojas* stated that "the Supreme Court and Seventh Circuit have affirmatively rejected due process challenges to the detention of unadmitted aliens in other settings," and relied on the Seventh Circuit's rejection of "an alien's due process challenge to his mandatory detention while awaiting the conclusion of removal proceedings after his conviction on aggravated sexual assault charges." *Id.* at *12–*13 (citing *Demore v. Kim*, 538 U.S. 510 (2003); *Parra v. Perryman*, 172 F.3d 954 (7th Cir. 1999)). However, as noted, the vast majority of district courts deciding this constitutional question have held that the application of the automatic stay provision does not comport with due process and the Second Circuit "has clearly indicated that, even where a noncitizen is subject to mandatory detention, the time in which an appeal is pending matters for purposes of determining whether detention has become so prolonged as to violate due process." *J.M.P.*, 2025 WL 2984913, at *16 (citing *Black*, 103 F.4th at 151). The Court in *Rojas* also held that the petitioner's "liberty interest is limited, and he has the key to his release in his own pocket; he can choose to accept removal to his homeland," *Rojas*, 2025 WL 3033967, at *13, but it is "no alternative" for Petitioner to "simply accept deportation to El Salvador—the country where he has said he fears harm and persecution if he returns," *J.M.P.*, 2025 WL 2984913, at *16. Petitioner's "appeal of the denial of his applications for asylum, withholding of removal, and CAT protection are still pending before the BIA, and he has the right to pursue that appeal." *Id.* Finally, the very automatic stay provisions that the Court in *Rojas* calls "procedural protections [which] highlight[] the substantial process that [the petitioner] is being provided," *Rojas*, 2025 WL 3033967, at *14, are the same procedures that grant DHS unilateral power to "bypass its burden of proof at bond hearings and usurp the role of the Immigration Judge" or the BIA, *Sampiao*, 2025 WL 2607924, at *10. Importantly, the automatic stay provisions "lack[] any reference to or establishment of any procedure for challenging its invocation" and "there can be no possible application of this regulation that would satisfy due process where it purports to authorize the most severe and recognized deprivation of liberty without a hint of a process to challenge such deprivation." *Herrera*, 2025 WL 2581792, at *12; *see also Hasan*, 2025 WL 2682255, at *11 ("In essence, the automatic stay imposed in immigration cases constitutes an unequivocal violation of due process. It is, in effect, no

from the Supreme Court, a case from within this District, and over 50 district court decisions in the last 6 months across the country. I decline that invitation.

### 1. The Private Interest

The first *Mathews* factor requires consideration of Petitioner's private interests affected by the Government's application of the automatic stay. As I previously found in the Opinion, and as the Government concedes, (Opp. 10), Petitioner's interest in freedom from detention "lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). The interest in being free from physical detention "is the most elemental of liberty interests." *Hamdi v. Rumsfeld*, 542 U.S. 507, 529 (2004); *see also United States v. Salerno*, 481 U.S. 739, 755 (1987) ("In our society liberty is the norm, and detention . . . is the carefully limited exception."). M.P.L. continues to be detained despite an IJ finding that further detention is unnecessary—now for approximately nine months—with each day further compounding his interest to be free from detention. Petitioner is "experiencing [many of] the deprivations of incarceration, including loss of contact with friends and family, loss of income earning, . . . lack of privacy, and, most fundamentally, the lack of freedom of movement." *Günaydin*, 784 F. Supp. 3d at 1187.

In arguing that Petitioner's detention is lawful, the Government places emphasis on its right to detain non-citizens. (*See* Opp. 10 ("[W]hile the Fifth Amendment entitles aliens to due process of law in deportation proceedings, detention during deportation proceedings [is] a constitutionally valid aspect of the deportation process. . . . Any assessment of the private interests at stake must also account for the fact that the Supreme Court has never held that aliens

---

process at all."). "And although a 'senior legal official' must certify that DHS's 'contentions justifying the continued detention of the alien have evidentiary support' and that its legal arguments are nonfrivolous in order to preserve the automatic stay, *see* 8 C.F.R. § 1003.6(c)(1)(ii), the regulation provides no standard to guide that official in making that determination." *Maza*, 2025 WL 2951922, at *4.

have a constitutional right to be released from custody during the pendency of removal

proceedings, and has in fact held precisely the opposite." (internal quotation marks omitted)).)

The Government's argument misses the point of Petitioner's due process argument

entirely. "[T]he issue here is not the permissibility of immigration detention, but rather the

process required in connection with such detention." *Valdez v. Joyce*, No. 25-CV-4627, 2025

WL 1707737, at *3 (S.D.N.Y. June 18, 2025) (citing *Velasco Lopez v. Decker*, 978 F.3d 842,

848 (2d Cir. 2020) ("Detention during removal proceedings is a constitutionally valid aspect of

the deportation process . . . our concern is . . . with the 'important constitutional limitations' on

that power's exercise.").)  Petitioner is not disputing the constitutional validity of detention

during deportation proceedings—instead, he disputes being detained after an IJ determined he be

released on bond and DHS invoked an automatic stay essentially nullifying the IJ's bond

determination.

  I already decided, in the Opinion, that Petitioner's private liberty interests after his then

seven-month detention were significant, under the Second Circuit's precedent in *Black v.

Decker*, which found that one petitioner's liberty interests were "seriously infringed" where he

had been detained for seven months, leading "unsurprisingly to serious financial difficulties for

his family," 103 F.4th 133, 151 (2d Cir. 2024).  *See M.P.L.*, 2025 WL 2938993, at *3.  Thus,

M.P.L.'s interest in freedom from detention continues to be particularly strong given that he has

been detained since February 27, 2025—for approximately nine months now—prior to the

individualized Bond Hearing, and continues to be detained since the October 28, 2025 Bond

Hearing, despite the IJ granting bond.  Moreover, M.P.L.'s interest is bolstered by the

individualized harm he continues to suffer, including being separated from his partner and

children, his employment and ability to earn an income as the sole provider for his family in New

18

York and assist his family in El Salvador, and his deep community ties to the Orthodox Jewish community in Queens. (*See generally* Doc. 30-4 ("Letters of Support").) In addition to M.P.L.'s own hardships, his family has experienced financial, caregiving, and emotional burdens due to his prolonged detention. (*See generally id.*; Doc. 16 ¶¶ 10–12.) For example, Petitioner's daughter wrote in her letter of support that she and her brother "ask [them]selves every day since [Petitioner] has been gone, if [they] will see him again," and notes that "financially it has become very difficult for [them] to cover [their] expenses like rent, the bills and [the] internet and phone services because [Petitioner] used to take care of all of that." (Letters of Support 11.) Petitioner's daughter further detailed that the "entire family and friends are suffering greatly," and that she has been "very sad" and suffering from "a lot of anxiety," and that her "mother is doing very poorly, sometimes she doesn't even eat because she's so worried about [Petitioner's] situation, and she's struggling with her nerves." (*Id.*) Petitioner's daughter remarked that without Petitioner, their "world has completely fallen apart." (*Id.*) Petitioner's son wrote in his letter of support: "[E]very day that I wake up I ask myself if I'm going to see my father again. . . . Plus my birthday is coming up and this would be my first birthday without him." (*Id.* at 18.) Additionally, Petitioner's private interest is affected by the prospect of enduring a further lengthy detention, one that may very well be beyond an additional 90 days under the automatic stay regulation. *See J.M.P.*, 2025 WL 2984913, at *16 (noting that the petitioner's "private interest is severely affected by the indefinite length of his continued confinement under the stay"). As Petitioner remarked, (Mem. 11 & n.8), and as explained *infra* Part III.B.2, under the automatic stay procedure, Petitioner's potential length of detention can range up to 150 to 177 days prior to DHS seeking a discretionary stay with the Attorney General, who then "may order a discretionary stay pending the disposition of any custody case by the Attorney General or by the

Board," 8 C.F.R. § 1003.6(d).  Petitioner's continued detention under the automatic stay

regulation may be longer than 90 days, and may in fact be many more months, or potentially

years, pending the Government's appeal of the IJ's bond determination.  *See infra* Part III.B.2.

Thus, the first *Matthews* factor weighs strongly in favor of Petitioner.

> ### 2. The Risk of an Erroneous Deprivation of Petitioner's Private Liberty Interests and the Probable Value of Additional Procedural Safeguards

The second *Mathews* factor is "the risk of an erroneous deprivation of [Petitioner's]

interest through the procedures used, and the probable value, if any, of additional or substitute

procedural safeguards."  *Mathews*, 424 U.S. at 335.  In analyzing this factor, "[t]he only interest

to be considered . . . is that of the detained individuals—not the government."  *Black*, 103 F.4th

at 152.  I find that the Government's invocation of the automatic stay to continue to detain

Petitioner, after an IJ found that he was not dangerous and imposed bond conditions that

mitigated any flight risk, does not simply risk an erroneous deprivation of his liberty but is in fact

already causing a deprivation of Petitioner's liberty interests.  *See J.M.P.*, 2025 WL 2984913, at

*17 (finding that "a stay creates a risk of erroneous deprivation where a detainee has already

prevailed in an adversarial hearing and been ordered released on bond").

The Government argues that there is no risk of erroneous deprivation because there are

"ample procedural safeguards [to] reduce the risk of error," and explains the automatic stay

procedure.  (*See* Opp. 10–11.)  This argument is misguided and ignores the reality of the

automatic stay.  The automatic stay regulation provides DHS with the unilateral power to extend

Petitioner's detention for several months after being granted a bond, again, without any review

by an IJ or the BIA.  The automatic stay process can be summarized as follows:

- The IJ orders DHS to release a detainee on bond.

- DHS files the Form EOIR-43 Notice of Intent to Appeal within one business day, triggering a 90-day detention period pending a decision from the BIA on the appeal. 8 C.F.R. § 1003.19(i)(2).

- DHS files Form EOIR-26 Notice of Appeal within ten business days. *See id.* § 1003.6(c)(1).

- The initial 90-day detention period may be extended to an additional 21 days, leading to a 111-day detention period, if the petitioner seeks, and the BIA grants, a 21-day extension of the briefing schedule. *See id.* § 1003.6(c)(4).

- If the BIA does not resolve the appeal within the 90-day period (or 111-day period, if the 90-day period is extended by 21 days), DHS can seek a "discretionary stay" for an additional 30 days. *See id.* § 1003.6(c)(5).

- If the BIA rules in the detainee's favor and authorizes his release, denies DHS's motion for a discretionary stay, or fails to act on such a motion before the automatic stay period expires, the stay is automatically extended for an additional 5 business days. *See id.* § 1003.6(d).

- If, within that 5-day period, the Secretary of Homeland Security or another designated official refers the case to the Attorney General, pursuant to 8 C.F.R. § 1003.1(h)(1), the stay is automatically extended for an additional 15 business days. *See id.* § 1003.6(d).

- Once such a referral is made, DHS can seek a "discretionary stay" with the Attorney General for the duration of the case, *i.e.*, extending the stay indefinitely pending disposition of the case. *See id.* § 1003.6(d).

Thus, M.P.L. may very well detained for several months, or potentially years, under the automatic stay regulation, notwithstanding his strong private interest in being free from detention. Notably, the Government stated that it is not aware of a case where DHS did not seek a discretionary stay around the time that the automatic stay was set to expire. (Tr. 23:11-17.) A detainee whom an IJ determined should be released on bond after an individualized analysis should not be subjected to guessing the length of his indeterminate detention based on the whims of whether DHS will choose to continue invoking automatic stays or to seek a discretionary stay.

First, as multiple district courts have already held, detainees, like Petitioner, who have received a bond hearing and are ordered released on bond face a "significant risk of erroneous

deprivation . . . because the only detainees subject to the automatic stay are those whose

detention an IJ has already determined to be unsupported by sufficient evidence." *J.M.P.*, 2025

WL 2984913, at *17 (internal quotation marks omitted) (collecting cases).  That is because the

DHS may only invoke the automatic stay after they have "lost" before an IJ who determines that

a detainee should be released on bond.  At the Order to Show Cause Hearing, the Government

said that it was not aware of any instance in which DHS did not seek an automatic stay when a

bond determination was decided in favor of a detainee.  (*See* Tr. 15:9-13.)  Although this fact

does not necessarily mean that there are not instances in which DHS did not seek an automatic

stay, if there were cases where DHS did not seek an automatic stay, I would expect DHS to have

provided that information to counsel.  One court has aptly described the automatic stay process

as follows:

> The automatic stay regulation effectuates detention only of individuals who have
> already demonstrated to an Immigration Judge's satisfaction that they do not pose
> a sufficient danger or flight risk to warrant ongoing detention. . . .  Consequently,
> the automatic stay regulation empowers ICE—the losing party in the bond
> hearing—to unilaterally override the decision of the [Immigration] Judge and keep
> the noncitizen detained pending appeal. Such a rule allows the government to
> bypass its burden of proof at bond hearings and usurp the role of the Immigration
> Judge.  And although a senior legal official must certify that DHS's contentions
> justifying the continued detention of the alien have evidentiary support and that its
> legal arguments are nonfrivolous in order to preserve the automatic stay, . . . the
> regulation provides no standard to guide that official in making that determination.
> Ordinarily, to obtain a stay of a judge's order requires a party to, *inter alia*, make a
> strong showing that it is likely to succeed on the merits of its challenge to that order.
> In contrast, the automatic stay regulation is effectively a unilateral automatic stay
> pending appeal as of right afforded to the losing party—the agency official who has
> just failed to present evidence or argument sufficient to convince a neutral
> decisionmaker that detention is warranted.

*Maza*, 2025 WL 2951922, at *4 (internal quotation marks omitted).  Thus, the automatic stay

provision creates a substantial risk of erroneous deprivation of Petitioner's liberty interest

because he has already been ordered to be released on bond after an individualized bond hearing

by an IJ.  *See J.M.P.*, 2025 WL 2984913, at *17 (finding that "a stay creates a risk of erroneous deprivation where a detainee has already prevailed in an adversarial hearing and been ordered released on bond").

Second, the automatic stay provision applies, by definition, automatically, without providing the Petitioner an opportunity to be heard prior to its implementation, disrupting the very core of due process.  *See Mathews*, 424 U.S. at 333, 348–49 ("The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner. . . . The essence of due process is the requirement that a person in jeopardy of serious loss (be given) notice of the case against him and opportunity to meet it." (internal quotation marks omitted and alteration in original)).  The automatic stay provision merely states that it may be invoked "[i]n any case in which DHS has determined that an alien should not be released or has set a bond of $10,000 or more."  8 C.F.R. § 1003.19(i)(2).  "Multiple courts have held that the automatic stay procedure creates an extraordinarily high risk of erroneous deprivation of a noncitizen's liberty interest because the text of the regulation provides no identifiable standard, and the regulation provides no discernable process to guide the relevant agency official's decision, other than it must be invoked pursuant to undefined DHS review procedures, and the vague requirement that an official must certify that the stay has evidentiary and legal support." *J.M.P.*, 2025 WL 2984913, at *18 (internal quotation marks omitted); *see also Cabrera*, 2025 WL 3072687, at *12 (D. Nev. Nov. 3, 2025) ("Such an undefined and subjective standard clearly creates a likelihood of arbitrary and capricious application. . . . [T]he regulation facially provides no discernable standard to guide the relevant agency official's decision to enact the automatic stay, other than the vague requirement that the stay be invoked pursuant to some unspecified internal procedures established by DHS, and certified to be warranted under the facts and law by

an official."). The Government did not have to offer any analysis, individualized or otherwise, to justify Petitioner's continued detention; instead upon filing the Form EOIR-43, the automatic stay was invoked without further review by either an IJ or the BIA. (*See* Tr. 10:4-16, 14:22-15:4; *see also* 8 C.F.R. § 1003.19(i)(2) ("[A]ny order of the immigration judge authorizing release (on bond or otherwise) shall be stayed upon DHS's filing of a notice of intent to appeal the custody redetermination (Form EOIR-43) with the immigration court within one business day of the order.").)

Third, "the risk of erroneous deprivation caused by the stay is exacerbated by the lack of any burden placed on DHS to prove the need for [M.P.L.'s] continued detention." *J.M.P.*, 2025 WL 2984913, at *18. The automatic stay "produces a patently unfair situation by taking the stay decision out of the hands of the judges altogether and giving it to the prosecutor who has by definition failed to persuade a judge in an adversary hearing that detention is justified." *Ashley*, 288 F. Supp. 2d at 671 (cleaned up); *see Leal-Hernandez*, 2025 WL 2430025, at *14 ("The automatic stay is a violent distortion of proper, legitimate process whereby the Government, as though by talisman, renders itself at once prosecutor and adjudicator."); *Mohammed H.*, 786 F. Supp. 3d at 1158 ("Simply by fiat—without introducing any proof and without immediate judicial review—the Government effectively overruled the bond decision and kept Petitioner detained. In doing so, the automatic stay rendered Petitioner's continued detention arbitrary and gave him no chance to contest the Government's case for detention."); *Herrera*, 2025 WL 2581792, at *10 (By "conferring unreviewable discretionary authority in the [ ] prosecuting agency official," the automatic stay creates a "conflict of interest . . . that makes erroneous deprivation not just a risk, but likely."). The automatic stay allows the Government to keep Petitioner detained indefinitely simply because it disagrees with what the IJ or BIA orders,

effectively overruling a decision made after an individualized analysis, without any foreseeable end date and without an opportunity to challenge the continued detention. This heads I win, tails you lose process deprives Petitioner of his due process rights and has no place in the law.

Thus, the second *Matthews* factor weighs strongly in favor of Petitioner.

### 3. The Government's Interest

The third and final *Mathews* factor considers, the "Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." 424 U.S. at 335.

The Government argues that the automatic stay provision "serves the legitimate purpose of maintaining the status quo pending further proceedings that may reverse what DHS believes to be an erroneous custody order" and that "[w]ithout an automatic stay, the government would bear an unacceptable risk that the alien will be released and abscond or cause harm." (Opp. 11–12.) The Government further argues that "[t]hese risks are especially salient here where M.P.L. has admitted to being a member of MS-13, a designated foreign terrorist organization." (*Id*. at 12.) As an initial matter, the Government has disavowed relying on the contradictory Form I-213s in this proceeding, (*see* Tr. 28:5-6), to allege that Petitioner is an active member of MS-13 but not the other points that DHS is relying on, including the fact that Petitioner has tattoos he got when he was younger—which he has tried to cover up, (Doc. 15 ¶ 9)—indicating an affiliation with MS-13, along with the fact that Petitioner withdrew his asylum application and withholding of removal, after he conceded that he was ineligible for that relief, (Morrow Decl. ¶ 14), and pursued only a deferral of removal under CAT, (*id*). (*See* Tr. 27:2-17.) The Government also appears to be relying on Petitioner's response of "Yes, MS-13" to the question "Have you ever been in a gang," (Morrow Decl. ¶ 6), although that is not a statement confirming

that Petitioner is currently a member of MS-13.  It is astounding that the Government is not aware whether DHS has undertaken any analysis of Petitioner's tattoos or even investigated whether he has been engaged in MS-13-related activities in the United States.  (*See* Tr. 27:18-28:23.)  I find it troubling that the Government's position appears to be "once an MS-13 member, always an MS-13 member," which I find is not sufficient on its own to establish that Petitioner is a danger to the community, especially in light of the fact that he has lived in the United States for 18 years without a criminal record, or any record of affiliating with MS-13, and the IJ determined that he was not a danger to the community, (*see* Bond Hearing Tr. 35:23-25).

I find that the Government's interests in ensuring appearance at removal proceedings and mitigating the risk of danger are protected under existing safeguards such as the mandatory detention provisions of 8 U.S.C. § 1225(b) or § 1226(c) and the individualized bond determination by an IJ.  *See Herrera*, 2025 WL 2581792, at *11 (finding that the government's "interests are in fact protected by mandatory detention authority under Section 1225 and the individualized determination by an IJ pursuant to a heightened standard whether an individual should be granted bond at all under Section 1226"); *Hasan*, 2025 WL 2682255, at *12 (finding that the government's "interests are adequately protected by the mandatory detention procedures outlined in §§ 1225(b) and 1226(c) and by the individualized determination of an IJ as to whether an individual should be released on bond under § 1226(a)").  Although it is undoubtably true that the Government's interest in maintaining the status quo and preventing erroneous release and further harm are interests of high order, the asserted interest is not a strong one where the IJ found that Petitioner does not pose a risk of danger sufficient to warrant continued detention.  (*See* Bond Hearing Tr. 35:23-25; *see also Sampiao*, 2025 WL 2607924, at *1 ("The government does, indeed, have a legitimate interest in ensuring noncitizens' appearance at

26

removal proceedings and preventing harms to the community, but noncitizens subject to the automatic stay regulation have been deemed, subject to a bond order, to *not* pose such risks." (emphasis in original and internal citations omitted)).)  Moreover, as Petitioner notes in his reply brief, "the governmental objectives of keeping the community safe and ensuring M.P.L. appears at immigration proceedings are not served by keeping him detained when he has no criminal record in the United States, supports his family, is a valued community member, and has pending fear-based immigration relief."  (Reply 9.)  In light of the compelling interest in protecting the principles of due process, I cannot conclude that the interest in the "enforcement of immigration laws," (Opp. 12 (internal quotation marks omitted)), outweighs the interest in ensuring that the guarantees of the Constitution are enforced.

Therefore, the third *Matthews* factor thus weighs in favor of Petitioner.  As the balance of the *Mathews* factors favors Petitioner, his detention under the automatic stay violates his procedural due process rights under the Fifth Amendment, and he is entitled to release subject to making the bond payment and other conditions imposed by the IJ.  Having reached this conclusion, I need not reach Petitioner's arguments regarding substantive due process or that the use of the automatic stay provision is *ultra vires* to the INA.  *See Sampiao*, 2025 WL 2607924, at *12; *see also J.M.P.*, 2025 WL 2984913, at *14 n.19 (S.D.N.Y. Oct. 23, 2025) ("Because the procedural and substantive due process inquiries overlap, and because . . . any distinction between the resulting remedies would be 'largely academic in this case,' the Court does 'not separately address substantive due process concerns.'" (quoting *Black*, 103 F.4th at 142 n.12 (citation omitted))); *Valdez*, 2025 WL 1707737, at *2 ("Because this Court finds that Petitioner's detention violates his due process rights, it need not address his claims under the Immigration and Nationality Act.").

IV.    <u>**Conclusion**</u>

For the reasons stated above, Petitioner's Motion is GRANTED and Respondents are ordered to immediately release Petitioner from custody upon the posting of the ordered bond in accordance with the conditions previously imposed in the IJ Order.  The Government shall file a status letter to update me about Petitioner's status by November 26, 2025.

The Clerk of Court is respectfully directed to close the motion at Doc. 30.

SO ORDERED.

Dated:  November 25, 2025
        New York, New York

Vernon S. Broderick
United States District Judge